UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SALMON SPAWNING & RECOVERY ALLIANCE, NATIVE FISH SOCIETY, and CLARK-SKAMANIA FLYFISHERS,<br><br>Plaintiffs,<br><br>v.<br><br>CARLOS GUTIERREZ, in his official capacity; UNITED STATES DEPARTMENT OF COMMERCE; *et al*.,<br><br>Defendants. | CASE NO. C05-1877RSM<br><br>ORDER GRANTING MOTION TO DISMISS |

This matter is now before the Court for consideration of defendants' motion to dismiss for lack of jurisdiction. Oral argument was held on May 9, 2006, and the memoranda and arguments of the parties have been fully considered. For the reasons set forth below, the Court now grants the motion to dismiss.

BACKGROUND

Plaintiffs in this case are the Salmon Spawning & Recovery Alliance, the Native Fish Society, and Clark-Skamania Flyfishers (collectively the "Plaintiffs"). They name as defendants the U.S. Department of Commerce and the Secretary, Carlos Guiterrez;  the National Marine Fisheries Service ("NMFS") and its Northwest Regional Administrator, D. Robert Lohn; and the United States Department of State and Secretary of State Condoleezza Rice  (collectively the "Defendants"). Plaintiffs allege that Defendants have violated Sections 7 and 9 of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536(a)(2) and 1538(a)(1)(A), as well as §§ 702 and 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706,  by continuing to allow (by treaty) the harvest by Canadian fishermen of excessive numbers of

ORDER GRANTING MOTION TO
DISMISS - 1

certain stocks of Chinook salmon from U.S. waters. The treaty at issue is the Pacific Salmon Treaty ("PST"), which was first initiated in 1985 and re-negotiated in the 1990's, with the approval by both countries completed in 1999. As described more fully below, U.S. approval of the PST followed agency action which included a study of possible impacts of the treaty on endangered species such as salmon. Pursuant to the ESA, the State Department consulted with NMFS on the potential impacts of the treaty. NMFS issued a Biological Opinion ("BiOp") in 1999, concluding that the PST would have a positive effect on the survival of certain endangered Chinook salmon stocks because harvest rates would be reduced (as compared to fishing with no treaty). NMFS thus found that harvest rates under the PST would meet ESA standards.

   Twenty-six populations (referred to under the ESA as "evolutionary significant units" or "distinct population segments") of salmon and steelhead are listed as threatened or endangered under the ESA. On the Columbia River system, the ESA-listed populations include Chinook salmon from the upper basin (Snake River spring and fall runs, Upper Columbia spring run) and from the lower basin (Upper Willamette, Lower Columbia River). In Puget Sound, Chinook salmon are listed as threatened. Chinook salmon that are born in the Columbia River and Puget Sound drainages, once they mature and travel to the ocean, migrate north to Canadian and Alaskan waters. Their return migration takes the adult salmon through Canadian waters on their way back to the Columbia River and Puget Sound. Returning ESA-listed Chinook salmon are caught in substantial numbers in commercial and recreational fisheries conducted off the west coast of Canada, including fisheries in the Georgia Strait and off the west coast of Vancouver Island. Canadian fisheries catch a significant portion – on the order of 25 percent or more – of the ESA-listed Chinook salmon caught in all fisheries. Complaint, ¶ 16. The Pacific Salmon Treaty between the United States and Canada sets management objectives for fisheries off of Southeast Alaska, Canada, Washington and Oregon. A portion of the treaty sets rules for determining the catch of non-endangered Chinook salmon allowed in the U.S. and Canadian fisheries. In 1999, the U.S. State Department consulted with NMFS before agreeing to the Pacific Salmon Treaty. The 1999 Biological Opinion produced by NMFS as a result of that consultation approved the PST, concluding that the treaty would contribute to the survival of Snake River Fall Chinook, and would

ORDER GRANTING MOTION TO
DISMISS - 2

reduce harvest impacts on Puget Sound Chinook populations. Complaint, ¶¶ 24-32. In 2005, NMFS issued a BiOp regarding Puget Sound fisheries, acknowledging that Canadian harvest of Nooksack River-origin Chinook is well above the rate necessary to rebuild that population. NMFS also noted that combined U.S.-Canadian harvest rates are too high for Chinook originating in other areas (Skagit, Snohomish, Cedar and Sammamish Rivers, and Hood Canal rivers) to enable these populations to recover. This 2005 BiOp used different measurement criteria and evaluated certain populations that were not discussed in the 1999 BiOp. Complaint, ¶¶ 23-35.

Plaintiffs assert that under Section 9 of the ESA, 16 U.S.C. § 1538, this "taking" of endangered and threatened species is prohibited. They further assert that under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), all federal agencies must ensure that any actions authorized, funded or carried out by them do not jeopardize the continued existence of endangered species. It is Plaintiffs' contention that Defendants' continued participation in implementing the PST, and failure to either withdraw from the Treaty or request modifications, violate the ESA. They ask this Court to enjoin Defendants to comply with the ESA in this matter.

Defendants have moved to dismiss the complaint under F.R Civ P. 12(b)(1), for lack of subject matter jurisdiction, and under F.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. For the purposes of this motion, the allegations in Plaintiffs' complaint shall be taken as true.

## STATUTORY SCHEME

**The Endangered Species Act**

**1. Overview of the ESA**

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An endangered species is one that is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a threatened species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The ESA delegates responsibility to determine whether a species should be listed as endangered or threatened

to the Secretaries of the Interior and Commerce.  16 U.S.C. §§ 1533(a), 1532(15).  The Secretary of the Interior administers the ESA through the Fish and Wildlife Service ("FWS"), and the Secretary of Commerce administers the ESA through NMFS.  See 50 C.F.R. § 402.01(b).  NMFS has jurisdiction over the ESA-listed salmon populations at issue in this case.  Id.

**2.  ESA Section 7(a)(2)'s Consultation Requirement**

ESA Section 7(a)(2), in pertinent part, requires federal agencies to consult with NMFS to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species. "  16 U.S.C. § 1536(a)(2).  "[T]he obligation of each agency to 'insure' that its covered actions are not likely to jeopardize listed species is an obligation in addition to those created by the agencies' own governing statute." *Defenders of Wildlife v. EPA*,  420 F.3d 946, 967 (9th Cir. 2005);   See also, *Tennessee Valley Authority v. Hill*, 437 U.S. 173 (1973) (Section 7 is an "affirmative[] command").  If an agency determines that a particular action will have no effect on a listed species, Section 7(a)(2)'s consultation requirement is not triggered.  50 C.F.R. §§ 402.12, 402.14(b);  *Southwest Center for Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1447-48 (9th Cir. 1996).

 If an agency determines that "any action may affect listed species," then it must pursue either "informal consultation" or "formal consultation" with NMFS, as appropriate.  50 C.F.R. §§ 402.13, 402.14(a).  "Informal consultation is an optional process that includes all discussions, [and] correspondence" between the "action agency" and NMFS, and is "designed to assist the [action agency] in determining whether formal consultation . . . is required."  50 C.F.R. § 402.13(a).  No formal consultation is required if the action agency, as a result of informal consultation, "determines, with the written concurrence of [NMFS], that the proposed action is not likely to adversely affect any listed species. . . ."  50 C.F.R. § 402.14(b)(1).  Conversely, formal consultation is required if the proposed action is "likely to adversely affect any listed species."  See 50 C.F.R. §§ 402.13, 402.14(a)-(b).

Formal consultation begins when the action agency makes a written request for consultation and ends when NMFS issues a biological opinion.  16 U.S.C. § 1536 (b)(3); 50 C.F.R. §§ 402.14 (c), (g).  The biological opinion assesses "whether the action . . . is likely to jeopardize the continued existence of

ORDER GRANTING MOTION TO
DISMISS - 4

listed species . . ." 50 C.F.R. § 402.14(g)(4). If "jeopardy" is likely, NMFS must determine whether any "reasonable and prudent alternatives" ("RPAs") exist for the action to avoid jeopardizing the continued existence of the species in violation of Section 7(a)(2). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If the action is not likely to jeopardize the species, but will result in the incidental "take" of members of the species, then NMFS will provide an incidental take statement, along with the biological opinion, that imposes measures to minimize the impact of the take and exempts the agency from liability for prohibited take under ESA Section 9(a)(1)(B). 16 U.S.C. §§ 1536(b)(4), (o)(2).

**3.   ESA Section 9's Prohibitions**

Section 9(a)(1)(A) of the ESA, and its implementing regulations, prohibit the import of ESA-listed salmon into the United States. 16 U.S.C. §§ 1538 (a)(1)(A) (prohibiting the import of endangered species); 50 C.F.R. § 223.203(a) (applying Section 9(a)(1)'s prohibitions to threatened salmon). Section 9(a)(1), in its entirety, provides that it is unlawful for any person subject to the jurisdiction of the United States to:

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

(C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

16 U.S.C. § 1538(a)(1).[1]

**4.   ESA Section 11's Enforcement Scheme**

ESA Section 11 sets forth the enforcement scheme for the ESA, establishing the penalties for

---

[1]Plaintiffs have not alleged how any Defendant named here falls within any of these prohibitions.

ORDER GRANTING MOTION TO
DISMISS - 5

both civil and criminal violations. 16 U.S.C. §§ 1540(a), (b). Congress directed that the provisions of the ESA "shall be enforced by the Secretary [i.e., Secretary of Commerce or Interior], the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating. . . ." 16 U.S.C. § 1540(e). The statutory reference to the Secretary of the Treasury now refers to the function of the CBP, under the Secretary of Homeland Security. 6 U.S.C. § 552(d).

In addition to governmental enforcement, Congress also permitted "any person" to commence a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A) (the "ESA's citizen-suit provision").

**Administrative Procedure Act ("APA")**

The APA's comprehensive provisions for judicial review of "agency actions" are set forth in 5 U.S.C. §§ 701-706. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). "Any person 'adversely affected or aggrieved' by agency action, see § 702, including a 'failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court,' see § 704." *Id*. "The standards to be applied on review are governed by the provisions of § 706." *Id*. However, a party is not entitled to judicial review "to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

## ANALYSIS

**Standard of Review**

On a motion to dismiss under F.R.Civ. P. 12(b)(1), the plaintiff bears the burden of proving that the Court has jurisdiction to decide the case. *Kokkonen v. Guardian Life Insurance Co*., 511 U.S. 375, 377 (1994). "Federal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id*. (citations omitted). In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court is not limited to allegations in the complaint, but may consider material outside the pleadings. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("Unlike a Rule 12(b)(6) motion,

ORDER GRANTING MOTION TO
DISMISS - 6

a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court.").

Defendants alternatively move to dismiss under F.R.Civ.P. 12(b)(6), asserting that Plaintiffs fail to state a claim upon which relief can be granted. "The purpose of a motion to dismiss under rule 12(b)(6) is to test the legal sufficiency of the complaint." *North Star International v. Arizona Corp. Commission*, 720 F.2d 578, 581 (9th Cir. 1983). The Court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party." *Newman v. Sathyavaglswaran*, 287 F.3d 786, 788 (9th Cir. 2002). A complaint should not be dismissed under F.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "The court may dismiss a complaint as a matter of law for '(1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim.'" *Smilecare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (*quoting Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984)).

**Defendants' Motion to Dismiss under Rule 12(b)(1)**

Defendants have moved to dismiss under Rule 12(b)(1) on the basis that Plaintiffs have not properly invoked the jurisdiction of this Court. Defendants assert that Plaintiffs lack standing to do so.

The Constitutional minimums for standing were defined by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). The three required elements for standing are: (1) the Plaintiffs must allege facts showing injury in fact (actual or imminent injury, and not merely conjectural); (2) there must be a causal connection between the injury and the conduct complained of; in other words, the injury must be traceable to the challenged action of the defendant; and (3) it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561. The third element, redressability, requires an analysis of whether the Court has the actual power to correct or prevent the claimed injury. *Gonzales v. Gorsuch*, 688 F. 2d 1263, 1276 (9th Cir. 1982).

Defendants contend that the facts alleged by Plaintiffs, even if true, fail to establish either causation or redressability. As to causation, the law is that the injury has to be traceable to the action (or inaction)

ORDER GRANTING MOTION TO
DISMISS - 7

of the defendant, not the result of independent action by a third party. *Lujan*, 504 U.S. at 560. Here, the injury of which Plaintiffs complain is the loss of endangered salmon by overharvesting in Canada. This injury is directly caused by Canadian fishermen, parties who are not before the Court. The connection between that overharvesting and the actions of the Defendants—the issuance of the 1999 BiOp by NMFS and the State Department's negotiation of the Treaty—is simply too attenuated to amount to "causation." While Plaintiffs may speculate that the overfishing would not occur had the Defendants acted differently, the facts stated do not support such speculation. Before the PST, the Canadian fishermen took an even larger share of listed salmon stocks; so it cannot be said that either the BiOp or the Treaty is *causing* the overfishing. The 1999 BiOp simply concluded that the threatened and endangered Chinook stocks would be better off with regulation than without—a conclusion that Plaintiffs cannot, and have not, challenged.

The fact that the harvest levels allowed under the PST are now depleting the stocks may be entirely due to intervening, unnamed events, such as ocean warming or natural cycles in the salmon population. Further, the direct cause of the injury is the action of Canadian fishermen—independent third parties over whom this Court does not have jurisdiction. Plaintiffs have thus not met the "causation" requirement of the three-element test.

As to redressability, Defendants correctly assert that the Court does not have the power to direct Defendant State Department to re-negotiate the PST to reduce the harvesting of fish by Canadians. This is, as Defendants point out, the "most fundamental problem" with Plaintiffs' claim. Quite simply, this Court lacks jurisdiction to order the State Department to negotiate with a foreign sovereign. *Earth Island Institute v. Christopher*, 6 F. 3d 648, 653 (9th Cir. 1993). Nor may the Court direct the State Department to re-initiate consultation with NMFS, because the section 7(a)(2) duty to consult is triggered only by affirmative agency action, not by inaction. *Western Watersheds Project, et al., v. Matejko, et al.*, 456 F. 3d 922, 930 (9th Cir. 2006); *quoting Defenders of Wildlife,* 420 F. 3d at 967 (9th Cir. 2005). The Court thus has no power to correct the actual injury. *Gonzales v. Gorsuch*, 688 F. 2d at 1263.

## CONCLUSION

As Plaintiffs' complaint does not meet either the causation or the redressability requirement set

ORDER GRANTING MOTION TO
DISMISS - 8

forth in *Lujan*, they do not have standing to assert the claims herein. The complaint must therefore be dismissed for lack of jurisdiction. *Lujan*, 504 U.S. at 561. Defendants' Rule 12(b)(1) motion to dismiss is therefore GRANTED and the complaint is hereby DISMISSED for lack of jurisdiction. As this ruling is dispositive of the action, the Court does not address the alternative Rule 12(b)(6) motion.

DATED this 12 day of September 2006.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE